## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **VALERIE K. HILEMAN,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00045 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

*I. Background and Standard of Review*

Plaintiff, Valerie K. Hileman, ("Hileman"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hileman protectively filed her application for DIB on December 7, 2017, alleging disability as of June 23, 2017, based on irritable bowel syndrome with diarrhea; high blood pressure; diabetes; acid reflux; urinary tract infections; anxiety; depression; residuals from a right ankle fracture; and numbness in her right foot. (Record, ("R."), at 12, 161-62, 193, 224, 246.) The claim was denied initially and upon reconsideration. (R. at 88-90, 95-98, 100-02.) Hileman then requested a hearing before an administrative law judge, ("ALJ"). (R. at 103-04.) The ALJ held a hearing on March 5, 2020, at which Hileman was represented by counsel. (R. at 32-58.)

By decision dated April 23, 2020, the ALJ denied Hileman's claim. (R. at 12-25.) The ALJ found Hileman met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2023. (R. at 14.) The ALJ found Hileman had not engaged in substantial gainful activity since June 23, 2017,[2] the alleged onset date. (R. at 14.) The ALJ determined Hileman had severe impairments, namely right ankle fracture, status-post open reduction and internal fixation; diabetes mellitus, type II; irritable bowel syndrome; obesity; degenerative changes in the cervical spine; anxiety; and depression, but she found Hileman did not have an

---

[2] Therefore, Hileman must show she was disabled between June 23, 2017, the alleged onset date, and April 23, 2020, the date of the ALJ's decision, to be eligible for benefits.

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.) The ALJ found Hileman had the residual functional capacity to perform repetitive, unskilled light work,[3] except she could stand, walk and sit for no more than six hours each in an eight-hour workday; she could frequently reach overhead; she could occasionally push and pull, climb ramps and stairs, balance, stoop, kneel and crouch; she could never crawl; she must avoid concentrated exposure to temperature extremes and excess humidity; and she must avoid all exposure to hazardous machinery, work at unprotected heights, climbing of ladders, ropes and scaffolds and working on vibrating surfaces. (R. at 18.)

The ALJ further found Hileman was able to understand, remember and carry out simple instructions; she could attend, persist, maintain pace and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek; she could have occasional interaction with the general public, co-workers and supervisors; she could respond appropriately to supervision, co-workers and usual work situations; and any time off task would be accommodated during normal breaks. (R. at 18.) The ALJ found Hileman was unable to perform any of her past work. (R. at 23.) Based on Hileman's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Hileman could perform, including the job of a cafeteria attendant, a shipping receiving weigher and a checker. (R. at 24.) Thus, the ALJ concluded Hileman was not under a disability as defined by the Act from June 23,

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

2017, through the date of the decision, and she was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued her decision, Hileman pursued her administrative appeals, (R. at 268-70), but the Appeals Council denied her request for review. (R. at 1-5.) Hileman then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Hileman's motion for summary judgment filed June 14, 2021, and the Commissioner's motion for summary judgment filed July 14, 2021.

## II. Facts

Hileman was born in 1967, (R. at 36, 161), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Hileman has a college education and past work experience as a customer service representative. (R. at 35, 37, 194.)

Laura Pizzurro, a vocational expert, was present and testified at Hileman's hearing. (R. at 52-56.) Pizzurro was asked to consider a hypothetical individual of Hileman's age, education and work history, who could perform light work, except she could stand and walk no more than two hours each in an eight-hour workday, but with a change in posture between standing and sitting every 20 to 30 minutes briefly in place without leaving the work station; she could frequently reach overhead; she could occasionally push and pull, climb ramps and stairs, balance, stoop, kneel and crouch; she could never crawl; she must avoid concentrated exposure to temperature extremes and excess humidity; and she must avoid all

exposure to hazardous machinery, work at unprotected heights, climbing of ladders, ropes and scaffolds and working on vibrating surfaces. (R. at 52-53.) In addition, the hypothetical individual could understand, remember and carry out simple instructions in repetitive, unskilled work; she could attend, persist, maintain pace and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek; she could have occasional interaction with the general public, co-workers and supervisors; she could respond appropriately to supervision, co-workers and usual work situations; and any time off task would be accommodated during normal breaks. (R. at 53.) Pizzurro stated the hypothetical individual could not perform Hileman's past work, and there would be no other jobs that such an individual could perform. (R. at 53-54.) Pizzurro stated Hileman's work skills could not be transferred to skilled or semi-skilled work. (R. at 53.)

Pizzurro then was asked to consider the same hypothetical individual, but who could stand and walk no more than six hours in an eight-hour workday and who did not require a sit/stand option. (R. at 54.) Pizzurro stated such an individual could not perform Hileman's past work, but a significant number of other jobs existed that such an individual could perform, including jobs as a cafeteria attendant, a shipping receiving weigher and a checker. (R. at 54-55.) Next, Pizzurro was asked to consider the same hypothetical individual, but who would be limited to the use of her right upper dominant extremity to less than one-third of the workday. (R. at 56.) She stated all work would be eliminated. (R. at 56.)

In rendering her decision, the ALJ reviewed records from Dr. William Rutherford, Jr., M.D., a state agency physician; Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician;

Wellmont Medical Associates; Blue Ridge Orthopedics & Sports Medicine, ("Blue Ridge"); Johnston Memorial Hospital; Mountain States Rehabilitation; Southern Medical Group, Inc.; L. Andrew Steward, Ph.D., a licensed clinical psychologist; Mountain States Medical Group, ("Mountain States"); and Molly Gallacher, L.C.S.W., a licensed clinical social worker.

Dr. Alison D. Whitman, M.D., a physician with Wellmont Medical Associates, treated Hileman throughout 2017 for gastroesophageal reflux disease, ("GERD"); hypertension; diabetes mellitus; urinary tract infections; kidney stones; sinusitis; irritable bowel syndrome; and anxiety. (R. at 277-434.) During this time, Hileman's diabetes, GERD and hypertension were stable with medications. (R. at 293, 298, 333.) Hileman routinely denied gastrointestinal, neurological, musculoskeletal and psychiatric/behavioral problems. (R. at 300, 305-06, 312-13, 329, 335, 340, 345, 369.) Examinations showed Hileman was fully oriented; she was in no apparent distress; she had normal bowel sounds; her abdomen exhibited no distension, mass, tenderness, rebound or guarding; her musculoskeletal examination showed normal range of motion and no edema; she had normal reflexes; she had normal muscle tone and coordination; and her mood, affect, behavior, judgment and thought content were normal. (R. at 300-01, 306-07, 313-14, 318-19, 324, 329-30, 335-36, 340-41, 346, 356, 365, 370.)

On March 30, 2017, x-rays of Hileman's lumbar spine suggested partial lumbarization of the S1 joint, but no significant lumbar abnormality. (R. at 433.) June 28, 2017, x-rays of Hileman's abdomen showed no acute abdominal pathology. (R. at 434.) On August 25, 2017, Hileman saw Dr. Whitman and reported cramping and diarrhea with nausea. (R. at 348.) She reported medication helped her symptoms "some." (R. at 348.) On September 7, 2017, Hileman saw Dr. Whitman and

complained of marital problems and work stress. (R. at 353.) On September 21, 2017, Hileman requested that Dr. Whitman complete her disability paperwork. (R. at 358-61.) On October 23, 2017, Hileman again reported marital problems and work stress. (R. at 362.) She stated her irritable bowel symptoms were worsened with stress. (R. at 362.) On December 6, 2017, Hileman saw Dr. Whitman and reported she was doing okay. (R. at 367.) Her examination remained unchanged. (R. at 370.)

On February 3, 2018, Hileman presented to the emergency department at Johnston Memorial Hospital with an injury to her right ankle. (R. at 455-66.) Hileman's abdominal examination was normal; her mental status was appropriate; her recent and remote memory were intact; her motor strength was 5/5 in all extremities, with limited testing to the right ankle; her sensation was intact, including her right foot to light touch; she had swelling to her right ankle with bruising; and her right palm had small abrasions, but her wrist and hand were normal. (R. at 455-56.) X-rays of Hileman's right ankle showed a trimalleolar fracture/dislocation[4] and comminuted fracture of the distal diaphysis of the fibula. (R. at 450, 452.) Chest x-rays were normal. (R. at 450, 453.) Hileman's ankle was reduced and placed in a posterior and stirrup splint, and post-reduction x-rays showed Hileman's ankle to be well reduced. (R. at 450, 454.)

On February 13, 2018, Hileman underwent a right ankle open reduction and internal fixation. (R. at 442-43.) She received follow-up treatment for her right ankle injury at Blue Ridge, where she reported her pain was controlled, and she was doing well overall. (R. at 471-76.) She participated in physical therapy from April 18,

---

[4] A trimalleolar fracture is a type of ankle fracture involving the three bones called the medial, lateral and posterior malleoli. *See* https://www.healthline.com/health/trimalleolar-fracture (last visited Feb. 9, 2022).

2018, through May 31, 2018. (R. at 509-54.) On April 27, 2018, Hileman was fully oriented; she had an appropriate mood and affect; she had very minimal swelling of the right ankle; her incision was well aligned and healed; she had a "little bit" of tenderness to palpation over the lateral ankle, but no medial tenderness; she had stiffness, but was able to dorsiflex and plantarflex her ankle; and she had intact sensation. (R. at 471-72.) X-rays of Hileman's right ankle showed surgical hardware was well seated with no evidence of loosening. (R. at 472.) Hileman was advised to continue to weight bear and progress with activities as tolerated. (R. at 472.)

On May 22, 2018, Hileman saw Dr. Whitman and reported she had "a lot of anxiety" stemming from marital problems. (R. at 494.) Dr. Whitman reported Hileman's ankle was healing well, and her blood pressure and diabetes were doing well with medication. (R. at 494.) Hileman was fully oriented; she was in no apparent distress; she had normal bowel sounds; her abdomen exhibited no mass or tenderness; she had a slight limp on her right with limited range of motion of the right ankle; she had no clubbing, cyanosis, joint swelling or involuntary movements; and she was tearful when discussing her marriage, but she had intact insight and judgment. (R. at 495-96.)

On May 23, 2018, Hileman was seen at Blue Ridge and reported she was doing "quite well" with no issues, she was able to perform her normal activities, and she rated her pain at a one on a scale of one to 10. (R. at 502.) Hileman was fully oriented and in no acute distress; her surgical incision was well healed; she was able to move her ankle throughout with no deficits or discomfort; she ambulated with no assistive devices; she could fully bear weight on her bilateral lower extremities with a smooth and steady gait; she exhibited no limp; she was sensitive to light touch; and she was neurovascularly intact. (R. at 504-05.) X-rays of Hileman's right ankle

showed well-seated surgical hardware with no signs of loosening and evidence of interval healing in the distal fibula, medial malleolus and posterior malleolus. (R. at 505.)

On May 23, 2018, Dr. William Rutherford, Jr., M.D., a state agency physician, completed a medical assessment, finding Hileman could perform medium[5] work. (R. at 64-66.) He found Hileman could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; and frequently climb, balance, stoop, kneel, crouch and crawl. (R. at 65.) Dr. Rutherford opined Hileman had no manipulative, visual, communicative or environmental limitations. (R. at 66.)

On August 22, 2018, Dr. Whitman completed a medical assessment, indicating Hileman could occasionally lift and carry items weighing five pounds; she could stand and/or walk up to four hours in an eight-hour workday and could do so for an hour and 30 minutes without interruption; she had no limitations on her ability to sit; she could never climb, stoop, kneel, balance or crouch; she could occasionally crawl; she had a limited ability to push/pull; she was restricted from working around heights, moving machinery and vibration; and she would be absent from work more than two days a month. (R. at 562-64.)

On October 3, 2018, Dr. Whitman reported Hileman's right leg fracture was healing, but limited her movement. (R. at 894.) Hileman stated she avoided her ex-husband and going out in public. (R. at 894.) Hileman was in no apparent distress; she had normal bowel sounds; her abdomen exhibited no distension, mass,

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2020).

tenderness, rebound or guarding; her musculoskeletal examination showed normal range of motion and no edema; she had normal reflexes; she had a normal gait; and her mood and affect were normal. (R. at 895.)

On December 8, 2018, Dr. Jacob Nysather, D.O., a physician with Southern Medical Group, Inc., saw Hileman at the request of Disability Determination Services. (R. at 556-61.) Hileman alleged disability due to irritable bowel syndrome and right ankle pain. (R. at 556.) She reported abdominal cramping with intermittent episodes alternating between diarrhea and constipation. (R. at 556.) Hileman reported right ankle pain and occasional swelling, as well as numbness and tingling of the first and second digits on the right foot. (R. at 556.) She stated she was independent with her activities of daily living. (R. at 556.) Hileman was fully oriented and in no acute distress; she ambulated without assistance; her gastrointestinal and musculoskeletal examinations were normal; she could rise from a sitting position without assistance and stand on her tiptoes, heels and tandem walk without problems; she could bend and squat without difficulty; she had full grip strength with adequate fine motor movements, dexterity and ability to grasp objects bilaterally; she was cooperative; she did not appear depressed or anxious; she was able to communicate with no deficits; she had intact recent and remote memory; she had good insight and cognitive function; and she had good tone and strength in all muscle groups, with normal reflexes and intact sensation. (R. at 557-58.)

Dr. Nysather opined Hileman could sit, walk and/or stand for a full workday; she could lift and carry items without limitations; she could hold a conversation, respond appropriately to questions and remember and carry out instructions; and she would benefit from a low stress level job in prevention of irritable bowel syndrome symptoms. (R. at 558.)

On December 13, 2018, Stephen P. Saxby, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Hileman had no limitations in her ability to understand, remember or apply information and to interact with others; and mild limitations in her ability to concentrate, persist or maintain pace and to adapt or manage herself. (R. at 78-79.) Saxby opined Hileman did not suffer from a severe mental impairment. (R. at 78.)

On December 14, 2018, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, finding Hileman could perform medium work. (R. at 80-82.) He found Hileman could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; and frequently climb, balance, stoop, kneel, crouch and crawl. (R. at 81.) Dr. McGuffin opined Hileman had no manipulative, visual, communicative or environmental limitations. (R. at 81-82.)

On March 26, 2019, Hileman reported her symptoms of depression and anxiety were doing well on medication, and her irritable bowel symptoms were stable. (R. at 855.)

On June 17, 2019, Hileman saw Molly Gallacher, L.C.S.W., a licensed clinical social worker, for anxiety and "nerves." (R. at 898.) Hileman's mood was depressed; her appearance, behavior, speech and thought content were appropriate; and her thought process was organized. (R. at 899.) Gallacher's assessment was to rule out social anxiety disorder. (R. at 900.) Hileman saw Gallacher on nine

occasions through December 30, 2019.[6] (R. at 897.) During this time, Hileman focused on her ex-husband and his extramarital affair. (R. at 897-98.) She stated she was "embarrassed to go out" due to her ex-husband's behavior and because she feared seeing him. (R. at 897-98.)

On June 26, 2019, Hileman saw Candice Bolling, PA-C, a certified physician's assistant at Mountain States, and reported left buttock pain that radiated into her left leg. (R. at 889.) Hileman was in no acute distress; she had a normal positive attitude; she had no edema in her extremities; she had 1+ ankle jerk, bilaterally; and she had slight tenderness at the left SI joint. (R. at 892.) Bolling diagnosed type II diabetes mellitus; acute left-sided low back pain with left-sided sciatica; recurrent urinary tract infections; postmenopausal atrophic vaginitis; irritable bowel syndrome; and skin tag. (R. at 893.) Hileman's irritable bowel syndrome was stable, and conservative treatment was recommended for her low back pain with sciatica. (R. at 893.)

On July 29, 2019, Gallacher reported Hileman's mood was stable, but the following week, on August 5, 2019, Hileman reported she had encountered her ex-husband on two occasions the previous day, which resulted in a depressed mood. (R. at 897.)

On August 8, 2019, L. Andrew Steward, Ph.D., a licensed clinical psychologist, evaluated Hileman at the request of Hileman's attorney. (R. at 864-71.) Hileman reported physical, emotional and sexual abuse. (R. at 865.) She stated

---

[6] On December 30, 2019, Hileman asked Gallacher to complete an assessment on her capacity to perform work-related activities. Gallacher declined, as she had not seen Hileman in months and could not comment. (R. at 897.)

she had night terrors, flashbacks and ruminative thoughts. (R. at 865.) Hileman stated crowds, unexpected noise and children contributed to her anxiety. (R. at 865.) Hileman reported Prozac helped "at times." (R. at 866.) Her hobbies included crocheting, reading books and looking after her dogs and goats. (R. at 866.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Hileman obtained a full-scale IQ score of 95. (R. at 867-68.) The Beck Depression Inventory-II, ("BDI-II"), and the Beck Anxiety Inventory, ("BAI"), were indicative of severe depressive and anxiety-related symptomatology. (R. at 869.)

Hileman was adequately groomed; she was appropriately talkative; her affect was constricted, and her mood dysphoric; she was fully oriented; she exhibited no evidence of hallucinations, delusions or paranoia; her thought content and organization were not seriously impoverished and not confused; all mental functions, including fund of information, judgment, abstract reasoning, ability to perform calculations and attention and concentration fell within the average ranges; and all memory functions, including immediate, recent and remote fell within the average ranges. (R. at 864-65.) Steward diagnosed major depressive disorder, single episode, severe; generalized anxiety disorder; and panic disorder. (R. at 871.) He opined Hileman was permanently and totally disabled. (R. at 871.)

That same day, Steward completed a mental assessment, indicating Hileman had slight limitations in her ability to follow work rules; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 861-63.) He found Hileman had a satisfactory ability to use judgment in public; and to understand, remember and carry out detailed and complex job instructions. (R. at 861-62.) Steward found Hileman had a satisfactory to seriously limited ability to

deal with work stresses. (R. at 861.) He opined Hileman had serious limitations in her ability to relate to co-workers; to deal with the public; to interact with supervisors; to maintain attention and concentration; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 861-62.) He found Hileman had no useful ability to demonstrate reliability, and she would be absent from work more than two days a month. (R. at 862-63.)

On September 26, 2019, Hileman saw Bolling and reported pain and numbness in her right elbow and neck stiffness. (R. at 874.) Hileman was in no acute distress; her extremities had no edema; she had mild tenderness overlying the medial condyle of the right arm; she had decreased sensation; and she had muscle spasms, decreased extension, but otherwise good range of motion of the cervical spine. (R. at 877.) X-rays of Hileman's cervical spine showed moderate facet arthrosis at the C2-C3 and C3-C4 disc spaces, and x-rays of Hileman's right elbow were normal. (R. at 872-73.) Bolling diagnosed radicular right arm pain; pain and numbness of the right upper extremity; stiff neck; type II diabetes mellitus; and hypertension. (R. at 878.)

On January 23, 2020, Hileman saw Bolling and reported joint pain and stiffness and right arm swelling and numbness. (R. at 910.) Hileman was in no acute distress; she had no edema in her extremities; she had a normal gait; her right ankle had mild swelling, medially, but good passive range of motion; and she had numbness in the dorsal base of the right toe and second toe. (R. at 912.) Bolling diagnosed osteoarthritis of the cervical spine with radiculopathy; depression with anxiety; hypertension; radicular pain in the right arm; type II diabetes mellitus; and allergic rhinitis, unspecified seasonally, unspecified trigger. (R. at 913.) Hileman's osteoarthritis was treated conservatively. (R. at 914.)

That same day, Bolling completed a medical assessment, indicating Hileman could occasionally lift and carry items weighing five pounds; she could stand and/or walk four to five hours in an eight-hour workday, and she could do so for 30 minutes without interruption; she had no limitations on her ability to sit; she could never climb, crouch or crawl; she could occasionally stoop, kneel and balance; she had a limited ability to feel; and she would be absent from work more than two days a month. (R. at 901-03.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715

F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Hileman argues the ALJ erred by improperly determining her residual functional capacity by failing to properly consider the opinions of Dr. Whitman, Bolling, Steward and the state agency physicians. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating

source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[7]

Instead, an ALJ must consider and articulate how *persuasive* she finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[8] In

---

[7] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

[8] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to

evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how she considered each of them. Instead, when articulating her finding about whether an opinion is persuasive, the ALJ need only explain how she considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict

---

which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a) (2020). The ALJ found Hileman had the residual functional capacity to perform repetitive, unskilled light work, except she could stand, walk and sit up to six hours each in an eight-hour workday; she could frequently reach overhead; she could occasionally push and pull, climb ramps and stairs, balance, stoop, kneel and crouch; she could never crawl; she must avoid concentrated exposure to temperature extremes and excess humidity; and she must avoid all exposure to hazardous machinery, work at unprotected heights, climbing of ladders, ropes and scaffolds and working on vibrating surfaces. (R. at 18.) The ALJ further found Hileman was able to understand, remember and carry out simple instructions; she could attend, persist, maintain pace and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek; she could have occasional interaction with the general public, co-workers and supervisors; she could respond appropriately to supervision, co-workers and usual work situations; and any time off task would be accommodated during normal breaks. (R. at 18.)

In making her residual functional capacity finding, the ALJ stated she found the opinions of Drs. Rutherford, McGuffin and Nysather "less persuasive" and "inconsistent" with the overall evidence. (R. at 21-22.) The ALJ also found Bolling's opinion that Hileman could lift items weighing up to five pounds and stand and walk four to five hours in an eight-hour workday was not persuasive or consistent with the overall evidence. (R. at 23, 901-03.) Drs. Rutherford and McGuffin opined Hileman had the residual functional capacity to perform medium work with postural

limitations. (R. at 64-66, 80-82.) Dr. Nysather opined Hileman could sit, walk and/or stand for a full workday, and she could lift and carry items without limitations, but would benefit from a low-stress level job due to her irritable bowel syndrome. (R. at 558.) Based on Hileman's history of open reduction and internal fixation surgery to her right ankle, her complaints of ankle pain and cervical spine diagnostic imaging showing multilevel moderate facet arthrosis, the ALJ found that a more restrictive limitation to the light exertional level was appropriate. (R. at 21.) In addition, the ALJ noted Hileman's irritable bowel syndrome was stable with treatment. (R. at 21-22.)

The ALJ found Dr. Whitman's opinion to be "somewhat persuasive" and "somewhat consistent" with the overall evidence. (R. at 22, 562-64.) In addition to postural and environmental limitations, Dr. Whitman opined Hileman could occasionally lift and carry items weighing five pounds; she could stand and/or walk up to four hours in an eight-hour workday and could do so for an hour and 30 minutes without interruption; she had no limitations on her ability to sit; she had a limited ability to push/pull; and she would be absent from work more than two days a month. (R. at 562-64.) The ALJ found that, while the postural and manipulative restrictions were consistent with the evidence, the need for additional breaks, the reduction in standing and walking, the absenteeism and the limitations to lifting and carrying were not consistent with Hileman's examination findings. (R. at 22.)

As noted by the ALJ, a few months after Hileman's ankle surgery, she reported her pain was controlled, and she was doing well; she was able to ambulate with no discomfort or with the use of assistive devices; she had a normal gait; she was able to rise from a sitting position without assistance; she was able to bend and squat without difficulty; her abdomen had normal bowel sounds and exhibited no

distension, mass, tenderness, rebound or guarding; she had normal musculoskeletal examinations; she had intact sensation; she had normal cervical range of motion and normal range of motion in her shoulders; and she had normal grip strength. (R. at 22, 456, 471-73, 475, 495, 504-05, 557-58, 895.) Although Hileman reported right upper extremity pain and numbness, x-rays of her right elbow were normal. (R. at 873-74.) X-rays of Hileman's cervical spine showed moderate facet arthrosis at the C2-C3 and C3-C4 disc spaces, which was treated conservatively. (R. at 872-73, 914.) The record also shows that Hileman's irritable bowel syndrome and diabetes were stable with treatment. (R. at 21-23, 293, 298, 333, 494, 855, 893.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ also found the opinions of state agency psychologist Saxby and clinical psychologist Steward were not persuasive and were inconsistent with the overall evidence. (R. at 22.) Saxby opined Hileman did not suffer from a severe mental impairment. (R. at 78-79.) As noted by the ALJ, Hileman reported abuse, which resulted in flashbacks and ruminating thoughts. (R. at 865.) She also reported crowds and unexpected noise contributed to her anxiety. (R. at 865.) The BDI-II and the BAI were indicative of severe depressive and anxiety-related symptomatology. (R. at 869.) Based on this, the ALJ found Hileman's mental impairments were severe; thus, she limited Hileman to only occasional interaction with the general public, co-workers and supervisors. (R. at 18, 22.)

The ALJ found Steward's opinion that Hileman had serious limitations in her ability to make several occupational and personal/social adjustments and that she would be absent from work more than two days monthly were not consistent with the overall evidence. (R. at 22, 861-63.) Mental status examinations showed

Hileman's mood, affect, behavior, insight, judgment and thought content were normal; her recent and remote memory were intact; and she exhibited no evidence of hallucinations, delusions or paranoia. (R. at 301, 307, 314, 319, 324, 330, 336, 341, 346, 356, 365, 370, 456, 471, 558, 865, 895, 899.) In March 2019, Hileman reported her symptoms of depression and anxiety were doing well on medication. (R. at 855.) *See Gross,* 785 F.2d at 1166.

The record shows Hileman reported anxiety and depression stemming from marital problems and work-related stress. (R. at 353, 362, 494, 897-98.) Dr. Nysather found Hileman would benefit from a low-stress job to prevent irritable bowel symptoms, and Steward found Hileman had a satisfactory to seriously limited ability to deal with work stresses. (R. at 558, 861.) The ALJ limited Hileman to repetitive, unskilled work, which would accommodate the need for low-stress work. (R. at 18.) The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a) (2020); *Menkes v. Astrue,* 262 F. App'x 410, 412 (3d Cir. 2008) ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration."). Unskilled work is generally low stress and involves remembering only very short and simple instructions in a routine environment in which "concentration is not critical." Program Operations Manual System, ("POMS"), DI 25020.010(B)(3), available at secure.ssa.gov/poms.nsf/lnx/0425020010 (effective Apr. 5, 2007) (explaining that unskilled work involves "remember[ing] very short and simple instructions," and that "concentration is not critical").

Based on the above, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and her residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Hileman was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hileman's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of

the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     February 9, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE